IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| T & H BAIL BONDS, ET AL. | : | CIVIL ACTION |
| | : | |
| Plaintiffs | : | NO. 04-1290 |
| | : | (Judge Robinson) |
| v. | : | |
| | : | |
| LOCAL 199, LABORERS INTERNATIONAL UNION OF NORTH AMERICA, ET AL. | : | |
| | : | |
| Defendants | : | |

## BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.   BACKGROUND**

On or about September 17, 2004, plaintiffs, who operate a bail bond business, commenced an action in the Court of Chancery of New Castle, Delaware against Laborers Local 199 (hereinafter the "Union" or "Local 199") and two of its officers. In that action, they sought injunctive relief from certain activities, including picketing, handbilling and the display of an inflatable rat, plus damages for allegedly libelous and slanderous utterances and writings. Defendants removed that action to this Court on September 23, 2004.

On September 22, 2004, the defendant union filed an unfair labor practice charge with the National Labor Relations Board (hereinafter "NLRB"). On September 30, 2004, plaintiffs filed a memorandum of law in this Court in which they acknowledged that the Court lacked jurisdiction of those aspects of their complaint that fell within the exclusive jurisdiction of the NLRB, namely the propriety of the union's picketing. In that pleading, they suggested that the remaining aspects of their complaint be stayed pending the outcome of the NLRB charges. On November 8, 2004, defendants filed their answer and affirmative defenses with the Court.

1

On March 13, 2006, the Union withdrew its NLRB charges, and, subsequently, the Regional Director for the NLRB sent plaintiffs' counsel a letter informing him that she had approved the Union's request to withdraw the charge. On September 27, 2007, the Court entered the following an Order dismissing the complaint for lack of prosecution. On October 11, 2007, plaintiff filed a motion to reopen this matter, which the Court granted.

Defendants now move for partial summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, limiting their motion to Count I of the Complaint, and submit this brief in support of that motion.

## II.   ARGUMENT:   PLAINTIFFS' CLAIMS IN COUNT I ARE PREEMPTED

In Count I of the complaint, styled "Interference with Trade," plaintiffs allege that the defendants engaged in picketing at their business location, distributed "misleading" flyers (handbilled) and utilized an inflated "giant rat" "regarding the use of non-union labor." Compl. ¶4. That activity "is designed to cause economic harm" to the plaintiffs and "is causing safety concerns to Plaintiff and his customers" and is "causing potential customers to go elsewhere for bail bonds." *Id.* at ¶5. Regardless of the truth of those assertions, which is assumed in this motion, plaintiffs' remedy rests with the NLRB, which has exclusive jurisdiction over the claims raised in Count I due to the doctrine of preemption.

### A.   The Governing Legal Principles

As the Third Circuit has noted, "It is well established that state law claims are presumptively preempted by the NLRA[1] when they concern conduct that is actually or arguably either protected or prohibited by the NLRA. *Belknap, Inc. v. Hale,* 463 U.S. 491, 498, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983)." *Pennsylvania Nurses Association v. Pennsylvania State Education Association,* 90 F.3d 797, 801 (3d Cir. 1996), *petition for rehearing and rehearing en*

---

[1] 29 U.S.C. § 151, *et seq.*

*banc denied* (Aug. 26, 1996), *cert. denied* 519 U.S. 1110, 117 S.Ct. 947, 136 L.Ed.2d 835 (1997). Indeed, in a previously filed memorandum to this Court, plaintiffs acknowledged that the issues that concern the Union's picketing activities are preempted.[2]

While the preemption doctrine, as it applies to labor law, is not of recent origin, its most frequently cited source is the Supreme Court's decision in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). There, the Court explained the rationale for preemption:

> Thus, judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted. When the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the States from acting.

359 U.S. at 243. It then established what has become known as the "arguably subject to" test for preemption.

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by §7 of the National Labor Relations Act, or constitute an unfair labor practice under §8, due regard for the federal enactment requires that state jurisdiction must yield.
>
> * * *
>
> When an activity is arguably subject to §7 or §8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

*Id.* at 244-45. Moreover, even if the NLRB does not render a determination of the protected or prohibited nature of the activity in question, such failure "does not give the States the power to act. In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for [a]

---

[2] On or about September 30, 2007, plaintiffs filed what they styled "Plaintiff's Memorandum of Law." While it is not clear to what that memorandum was addressed, in it the plaintiffs acknowledged that because the Union had filed an unfair labor practice charge, the Court lacked jurisdiction to adjudicate anything over which the NLRB had jurisdiction.

3

Court to decide whether such activities are subject to state jurisdiction." *Id.* at 246. Nor does it matter whether the complaint seeks monetary relief for a past wrong, as opposed to injunctive relief for a current violation. "Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme." *Id.* at 247 (citing *Garner v. Teamsters Union*, 346 U.S. 485, 492-97, 74 S.Ct. 161, 166-69, 98 L.Ed. 228 (1953).

However, not all activities that would seemingly fall within the *Garmon* doctrine are preempted. Thus, if the activity "was a merely peripheral concern of the Labor Management Relations Act...[or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act," states are free to regulate the questioned activity. *Garmon*, 359 U.S. at 243-44. *See, e.g., Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) (trespass); *Farmer v. United Brotherhood of Carpenters and Joiners of America, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (intentional infliction of emotional distress); *Linn v. Plant Guard Workers*, 383 U.S. 53 (1966), 86 S.Ct. 657, 15 L.Ed.2d 582 (malicious libel); *Automobile Workers v. Russell*, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958) (mass picketing and threats of violence); *International Association of Machinists v. Gonzales*, 356 U.S. 617 (1958) (wrongful expulsion from union membership).

Additionally, preemption has not been applied "where the particular rule of law sought to be invoked before another tribunal is so structured and administered that, in virtually all instances, it is safe to presume that judicial supervision will not disserve the interests promoted

by the federal labor statutes." *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 297-98 (1971).

> As summarized by the Supreme Court in *Belknap, supra*:
>
> [S]tate regulations and causes of action are presumptively preempted if they concern conduct that is actually or arguably either prohibited or protected by the Act. The state regulation or cause of action may, however, be sustained if the behavior to be regulated is behavior that is of only peripheral concern to the federal law or touches interests deeply rooted in local feeling and responsibility. In such cases, the State's interest in controlling or remedying the effects of the conduct is balanced against both the interference with the National Labor Relations Board's ability to adjudicate controversies committed to it by the Act, and the risk that the State will sanction conduct that the Act protects.

463 U.S. at 498-99. Additionally, even where an issue is one of particular state concern, "the Court has cautioned that…any state concern must be balanced against the risk that the exercise of state jurisdiction over the tort claim would interfere with the regulatory jurisdiction of the NLRB." *Pennsylvania Nurses Ass'n., supra*, 90 F.3d at 803-804 (citing *Local 926, Int'l Union of Operating Engineers v. Jones*, 460 U.S. 669, 676, 103 S.Ct. 1453, 1458-59, 75 L.Ed.2d 368 (1983)).

B.   **The Application of Those Principles to Plaintiffs' Claims**

Plaintiffs' claims in Count I fail to meet the exacting standards necessary to survive the preemptive effect of the NLRB's primary jurisdiction. All three issues, the Union's picketing, its handbilling and its use of the inflatable rat, are, at a minimum, "arguably" protected and thus beyond the reach of state law.

It has long been recognized that informational picketing is a form of speech that is protected under the First Amendment. *See Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *see also DeBartolo Corp. v. Fla. Gulf Coast Bdg. & Const.*, 485 U.S. 568, 576, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Similarly, the distribution of handbills is also an

exercise of First Amendment speech that does not violate federal labor law, *DeBartolo Corp., supra,* as is the use of an inflatable rat, which "has long been a symbol of labor unrest." *Int'l Union of Operating Engineers, Local 150 v. Village of Orland Park*, 139 F.Supp. 950, 958 (N.D.Ill. 2001); *see Tucker v. City of Fairfield*, 398 F.3d 457, 462 (6th Cir.), *cert. denied,* 126 S.Ct. 399, 163 L.Ed.2d 277 (2005) ("use of a rat balloon to publicize a labor protest is constitutionally protected expression"). Nevertheless, if utilized improperly, these activities may violate the provisions of the Labor Management Relations Act (the "Act") that govern certain union conduct, specifically Sections 8(b)(4)(i) and (ii)(B), 29 U.S.C. §§158(b)(4)(i), (ii)(B).

Section 8(b)(4) of the Act states, in relevant part, that it is an unfair labor practice for a labor organization:

> (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person....

29 U.S.C. §158(b)(4)(i)(ii)(B).

Although plaintiffs' complaint is less than a model of clarity, paragraph 4, which is restated below in its entirety,[3] asserts that the Union's picketing and related activities are directed at the plaintiff regarding the use of non-union labor by a company with which it has no business

---

[3] "4. Starting on September 14, 2004, and continuing intermediately since, the Defendants and its members has been picketing at Plaintiff business location of 632 King Street, Wilmington, Delaware, distributing mis-leading flyers and inflating a giant rat, directed at the Plaintiff at his Wilmington offices regarding the use of non-union labor at job sites of a company called LCC. The Plaintiff has no business relationship with LCC, which is owned by Bob Lubach."

6

relationship. Those allegations, if true, would assert secondary pressure by the Union in violation of Section 8(b)(4) of the Act.

The limitations on the combined use of picketing, handbilling and the use of an inflatable rat are thoroughly discussed in an NLRB Advice Memo concerning a charge against Local 78 of the Asbestos, Lead and Hazardous Waste Laborers Union by a New York City apartment building, the Hampshire House. *See* NLRB General Counsel Memo, Division of Advice, Case 2-CC-2581 (June 25, 2003), 2003 WL 23469282.[4] In that matter, the building contracted to have asbestos abatement work performed, which was done by a non-union contractor. After the work was completed, Local 78 protested the use of the non-union contractor by handbilling, using an inflated rat and what was termed other "confrontational" activities that were directed at potential customers.

The Division of Advice concluded that the union's conduct violated Section 8(b)(4)(i) and (ii)(B) of the Act. At page three of the memo, it stated:

> We conclude that by deploying the rat balloons and taking other action near the service entrance, the Union induced and encouraged Building employees, delivery drivers, and other employees to withhold their services from the Building in violation of Section 9(b)(4)(i)(B). We also conclude that by deploying the rats near the main entrance to the Building and engaging in confrontational conduct, Union agents attempted to prevent consumers from patronizing the Building, and thereby violated Section 8(b)(4)(ii)(B) by coercing the Building to cease doing business with an asbestos abatement subcontractor.

Advice Memo at 3.

Although the sparse facts alleged by plaintiffs in their Complaint are not identical to those set forth in the Advice Memo, they are sufficiently close to leave little doubt that the Union's conduct was, at a minimum, "arguably prohibited" by the Act. That being the case, the

---

[4] For the convenience of the Court, a copy of that memo is attached hereto.

preemption doctrine is applicable and requires the dismissal of Count I in its entirety, absent the application of one of the *Garmon* exceptions.[5]

Certainly it cannot be said that the activity was "a merely peripheral concern" of the Act. Indeed, picketing and handbilling have long been the focus of the NLRB as well as the federal courts. Unlike *Sears, supra*, there is no contention that the Union's activities constituted a trespass, nor, as in *Russell, supra*, that there was mass picketing or threats of violence. Rather, all that is alleged is that the Union engaged in conduct that arguably violated the LMRA or was protected by the Act and constituted the type of activity that the NLRB has regulated for decades. Accordingly, no exception to the preemption doctrine is applicable, and the Court should dismiss Count I of the Complaint.

Respectfully submitted,

/s/ Joseph J. Rhoades

---

Joseph J. Rhoades (Bar ID 2064)
Law Offices of Joseph J. Rhoades
Suite 1200, Legal Arts Bldg.
1225 King Street
P.O. Box 874
Wilmington, DE 19899
Attorney for Defendants
Tel. (302) 427-9500
Fax (302) 427-9509
Email: joe.rhoades@rhoadeslegal.com

Of Counsel:
MARKOWITZ & RICHMAN
Jonathan Walters, Esquire
121 S. Broad Street, 11th Floor
Philadelphia, PA 19107
Telephone: (215) 875-3100
Telefax: (215)790-0668
Email: jwalters@markowitzandrichman.com
Dated: December 10, 2007

---

[5] Alternatively, if the Union's conduct was not arguably prohibited, it was at least arguably protected, which leads to the same result.

# ATTACHMENT –
# GENERAL COUNSEL'S ADVICE MEMORANDUM

2003 WL 23469282 (N.L.R.B.G.C.)

*1 SUBJECT: Local 78, Asbestos, Lead and Hazardous Waste Laborers (Hampshire House)

June 25, 2003

DIGEST NO.S:

536-2536-6000, 560-2575-6767-2500, 560-2575-6767-2500, 560-5067-4050, 560-7540-8060-6717, 578-8075-8050-7000, 578-8075-8050-7700

This case was submitted for advice as to whether a union's deployment of an inflated rat and distribution of handbills near the service entrance and the main entrance of a neutral employer's apartment building violated Section 8(b)(4)(i) or (ii)(B).

We conclude that the Union violated Section 8(b)(4)(i)(B) by stationing its inflated "rats" near the Building's service entrance and signaling employees to take sympathetic action. We further conclude that the Union violated Section 8(b)(4)(ii)(B) by deploying its "rats" near the main entrance to the Building and engaging in other confrontational conduct to prevent consumers from patronizing the Building, and thereby unlawfully coercing the Building to cease doing business with an asbestos abatement subcontractor. Accordingly, the Region should issue a Section 8(b)(4)(i) and (ii)(B) complaint, absent settlement.

## FACTS

Hampshire House ("the Building") is a 223-apartment, 36-story, cooperative apartment building located on the south side of Central Park in New York City. The Building's approximately 46 building service employees are represented by New York Hotel and Motel Trades Council, AFL-CIO.

The main entrance to the Building faces north and is covered by a large square canopy. East of the main entrance is a second canopied entrance which leads to commercial space within the Building.[FN1] Immediately east of the entrance to the commercial space is the Building's service entrance, used by Building employees and those making deliveries to the Building.[FN2] All entrances to the Building are directly on the public sidewalk, which separates the Building from the street.

At some time in late 2002, the Building contracted with B & A Demolition to perform demolition work, including asbestos abatement work, related to the Building's plan to transform the defunct restaurant to a day spa. B & A contracted with Home Environmental Laboratories (HEL) to perform the asbestos abatement work on the project. HEL completed the asbestos abatement work on about February 4, 2003; there has been no construction work at the Building since February 4.

On or about March 5, Sam Erwin, a business agent for Laborers, Local 78 ("the Union"), contacted Building Vice President and General Manager Patrick Lappin and asked who performed the asbestos abatement work. Lappin told Erwin that he did not know who performed the asbestos work, but that he would look into it and get back to Erwin.

The following day, Erwin and another Union agent went to the Building to get information regarding the asbestos abatement work and the Building's policies regarding using union labor. There, the Union agents spoke with the Building's chief engineer, Abraham Samadpour. Samadpour described to Erwin the Building's bid procedure and explained that the Building did not have a formal policy regarding the use of Union contractors, only that they chose the contractor with the best price. Erwin told Samadpour that in the future, the Building would use Union workers. Erwin also told Samadpour that the Union would put an inflated "rat" outside the building the following morning.

*2 The next morning, and on 12 more occasions between March 7 and April 4, the Union deployed one of two inflated rats on the sidewalk outside the Building. The smaller "rat" was 12 - 15 feet tall; the larger "rat" was approximately 28 - 30 feet tall. The rats were always positioned, at least partially, on the sidewalk in front of the building, relatively close to the main entrance.

The Union's placement of the rats was often dictated by the Building's efforts to prevent the Union from deploying the rats at all. For example, the Building parked a truck and a car in front of the Building, then later had two large garbage containers delivered to the front of the Building as it attempted to interfere with the Union's efforts to deploy the rats outside the main entrance. Thus, on at least one occasion, the Union positioned its rat east of the main entrance and in front of the service entrance; other times it was positioned either near the main entrance or just east of the main entrance near the end of the containers. Though precise distances are unavailable, it appears that the rat was never more than thirty yards from either the main entrance or the service entrance.

The Union initially deployed the rat without affixing any sign or banner to the rat. After the third episode, however, the Union adorned the rat with a sign that read, "Hampshire House Hires Asbestos Cos. [sic] That Exploit Workers." The Union kept that sign on its rat for the next several days, but changed the sign on March 26 to read, "Hampshire House Local 78 Says Support 'Our' Troops."

Each time the Union deployed a rat outside the Building, it also deployed two Union agents to handbill the Building's tenants and the general public, which would include prospective tenants. At least one of these agents wore a jacket with a Union insignia on the back. The handbill read, in part:[FN3]

> 150 Central Park South is undergoing/has undergone deadly asbestos abatement by Home Environmental Laboratories a company that is destroying industry standards by exploiting its immigrant workers by cheating them and their families out of benefits such as medical, dental and pension.
> Is Abraham Samadpour's decision to hire substandard non-union companies with no experience putting his tenants and employees at risk?

* * *

> Call Abraham Samadpour of the Hampshire House at [Building Telephone Number] and demand that responsible contractors be hired to perform this hazardous work!

* * *

In smaller print at the bottom of the handbill was the following disclaimer:
> We are appealing only to the public. We are not seeking to induce any person to cease work or refuse to make deliveries.[FN4]

There is no evidence that any Union agent attempted to handbill Building employees.

Employer witnesses report that Union handbillers often yelled from their positions on the sidewalk near the inflated rat for Lappin and Samadpour to engage them and for Lappin to "do the right thing." Union agents also allegedly yelled to passers-by that the Building was "the rat house," "the exploitation house," and "the shit house." There are also reports that Union agents aggressively confronted tenants and passersby who tried to ignore the handbillers. Lappin witnessed Union agents on one occasion walking "in an elliptical pattern" with handbills from approximately 15 feet on one side of the rat to approximately 15 feet on the other side of the rat.

**\*3** Since April 4, Union handbillers have twice returned to the Building, each time without an inflatable rat. Since April 21, there has been no Union activity, or threat of Union activity, at the Building.

ACTION

The Region should issue an 8(b)(4)(i) and (ii)(B) complaint, absent settlement. We conclude that by deploying the rat balloons and taking other action near the service entrance, the Union induced and encouraged Building employees, delivery drivers, and other employees to withhold their services from the Building in violation of Section 8(b)(4)(i)(B). We also conclude that by deploying the rats near the main entrance to the Building and engaging in confrontational conduct, Union agents attempted to prevent consumers from patronizing the Building, and thereby violated Section 8(b)(4)(ii)(B) by coercing the Building to cease doing business with an asbestos abatement subcontractor.

Although the Union's stated primary objective was to advise the public that HEL is a substandard contractor, it is clear that the Union had a secondary objective to force the Building, a neutral employer, to cease doing business with HEL. As evidence of the Union's secondary objective, we rely on Erwin's statement to Samadpour that the Building would, henceforth, use Union labor; the language of the handbills; and statements by Union handbillers.[FN5]

A. The Union's Conduct Violated Section 8(b)(4)(i)(B)

Section 8(b)(4)(i) of the Act proscribes inducing or encouraging employees of a neutral

employer to strike. The words "induce or encourage" are broad enough to include every form of influence and persuasion.[FN6] The provision thus proscribes communications that "would reasonably be understood by the employees as a signal or request to engage in a work stoppage against their own employer."[FN7] Such "signals" include union agents' presence near employee entrances,[FN8] or using signs or symbols to advise employees that a labor dispute exists.[FN9]

Here, the Union deployed large, inflated rats, a well-known symbol of labor unrest, accompanied by Union agents with Union insignia;[FN10] handbilled aggressively; and shouted to Building personnel, shouted about the Building, and shouted at tenants. The symbolism of the rats, the wording on the banners on the rats, and the Union's other conduct signaled to neutral employees that the Union had a dispute with the Building, and that the Union wanted Building employees, those making deliveries to the Building, and other employees providing services to the Building to take sympathetic action.[FN11] Such conduct, regardless of whether it was successful, could reasonably be exected to induce or encourage employees to engage in a work stoppage within the meaning of Section 8(b)(4)(i).[FN12]

The fact that no Building employee refused to work, and no deliveries to the Building were disrupted does not require a different conclusion. The Board, with the approval of the courts, has long held that success or failure of inducement is immaterial to the finding of 8(b)(4)(i) violations.[FN13] Thus, even if there is no evidence that any employee actually withheld services from the Employer, the Union's conduct here constitutes inducement and encouragement under Section 8(b)(4)(i)(B).

*4 We likewise conclude that the Union's disclaimer at the bottom of its handbill does not immunize the Union from liability for its inducement of employees.[FN14] Indeed, the "signal" conveyed by the Union's use of the rat and other conduct might well cause an employee to decide to honor the Union's invisible picket line before he or she received a handbill.

B. The Union's Conduct Violated Section 8(b)(4)(ii)(B)

"Section 8(b)(4)(ii) proscribes picketing and "all [union] conduct . . . inten [ded] to coerce, threaten, or restrain third parties to cease doing business with a neutral employer, although this need not be the union's sole objective."[FN15] Union picketing usually involves individuals patrolling while carrying placards; whether the placards are attached to sticks is immaterial.[FN16] The Board has long held, however, that the presence of traditional picket signs and/or patrolling is not a prerequisite for finding that a union's conduct is the equivalent of traditional picketing.[FN17] Additionally, the Board has found that a union can violate Section 8(b)(4)(ii)(B) by engaging in conduct that, while not technically characterized as picketing, "oversteps the bounds of propriety and [goes] beyond persuasion so that it [becomes] coercive to a very substantial degree."[FN18]

Traditional "picketing" does more than merely communicate information important to a union, it causes those who approach a location to take some sympathetic action, without inquiring into the information being disseminated.[FN19] Thus, mere persuasion of customers not to patronize neutral establishments is not, in and of itself, coercion within the meaning of Section 8(b)(4)(ii)(B). On the contrary, the Supreme Court in DeBartolo II[FN20] concluded that a union's

peaceful distribution of area standards handbills urging a consumer boycott of neutral employers did not constitute "restraint or coercion" under Section 8(b)(4)(ii)(B). The Court noted that there would be serious doubts about whether Section 8(b)(4) could constitutionally ban peaceful handbilling not involving non-speech elements.[FN21] Thus, because of the First Amendment considerations, the Court interpreted the phrase "threaten, coerce, or restrain" with "'caution,'" and not with a "'broad sweep'" to exclude non-picketing activities partaking of free speech.[FN22]

In determining whether employees are engaged in <u>DeBartolo</u> handbilling or (ii) coercion, the Board looks to whether, under the totality of the circumstances, a union is using conduct, rather than speech, to induce a sympathetic response. For example, because of its confrontational and coercive nature, the presence of mass activity involving crowds that far exceed the number of people necessary for solely free speech activity may constitute "a form of picketing."[FN23] The photographing of neutrals as they pass through an entrance has also been found to be an indicium of picketing in circumstances where it is found to be coercive.[FN24] And, as discussed above, the Board has found that union supporters patrolling, or signs posted near a facility's entrance may constitute picketing under certain circumstances.[FN25]

*5 Just as the Union's use of rats and other conduct induced and encouraged employees in violation of 8(b)(4)(i), the Union's deployment of rat balloons outside the main entrance and other confrontational conduct directed at tenants, prospective tenants, and consumers violated Section 8(b)(4)(ii). The Union confronted tenants and the general public using huge, inflated rats in front of the Building to convey that the Building was a "rat" employer. The size and placement of the rats along a city sidewalk, often flanked by parked vehicles and garbage containers and accompanied by confrontational Union agents, also created a "gauntlet" that forced pedestrians to confront the Union by passing directly in front of the rats and the Union agents posted there. Often, pedestrians, tenants, and visitors to the building were aggressively confronted by the Union pickets, or they were forced to navigate the gauntlet amid the Union agents' shouting for Lappin and Samadpour. These confrontational secondary activities, taken as a whole, would reasonably be expected to interfere with customers' and tenants' use of the Building[FN26] and, thus, unlawfully coerced the Building in violation of 8(b)(4)(ii).[FN27]

Accordingly, the Region should issue complaint, consistent with the above analysis, alleging that the Union violated Section 8(b)(4)(i) and (ii)(B).

Barry J. Kearney
Associate General Counsel
Division of Advice

FN1. The commercial space was, until January 2002, a restaurant. The Building has arranged to convert the space to a day spa.

FN2. Food deliveries and other personal deliveries made to tenants are taken to the main entrance.

FN3. The handbill text appears in all caps and in bold type.

FN4. This text was also in all caps, but was not in bold type.

FN5. After February 5, HEL had no presence at the Building and, therefore, the circumstances do not present a typical example of a common situs. Therefore, although the primary's absence from the premises reinforces that the union had a secondary object, we do not find it necessary to rely on the Union's failure to comply with the Moore Dry Dock criteria as evidence of the Union's secondary objective.

FN6. Electrical Workers IBEW Local 501 (Samuel Langer) v. NLRB, 341 U.S. 694, 701-02 (1951). See also, Service Employees Local 525 (General Maintenance Co.), 329 NLRB 638, 680 (1999) (by targeting tenants and other neutrals, union sought to induce or encourage employees to withhold their services); Laborers, Local 332 (C.D.G., Inc.), 305 NLRB 298, 305 (1991).

FN7. Chicago and Northeast Illinois Dist. Council of Carpenters, 338 NLRB No. 170, slip op. at 2 (2003), citing Los Angeles Bldg. & Constr. Trades Council (Sierra South Development), 215 NLRB 288, 290 (1974). See also Operating Engineers Local 12 (Hensel Phelps), 284 NLRB 246, 248 n. 3 (1987) ("signal picketing" is the term used to describe activity short of a true picket line that acts as a signal to neutrals that sympathetic action on their part is desired by the union) (citation omitted).

FN8. Iron Workers Pacific Northwest Council (Hoffman Construction), 292 NLRB 562, 562 n. 2, 571-576 (1989), enfd. 913 F.2d 1470 (9th Cir. 1990)(union supporters standing near picket sign at neutral gate signaled employees); Electrical Workers Local 98 (Telephone Man), 327 NLRB 593, 593 and n. 3 (1999)(finding "signal picketing" where, among other things, union agent stood near neutral gate and wore observer sign that flipped over to reveal same sign being used by union picketers at primary gate).

FN9. Teamsters Local 182 (Woodward Motors), 135 NLRB 851, 851 fn. 1, 857 (1962), enfd. 314 F.2d 53 (2d Cir. 1963)(union signaled employees when its agents stuck two picket signs in a snowbank and monitored the employer's facility from a nearby car); Laborers Local 389 (Calcon Construction), 287 NLRB 570, 573 (1987) (union signaled employees by placing signs at or near one or more of the entrances to common situs so that they could be read by anyone approaching them); Construction & General Laborers Local 304 (Athejen Corp.), 260 NLRB 1311, 1319 (1982) (union signaled employees by placing signs on safety cones, barricades, and on jobsite fence).

FN10. See, e.g., San Antonio Community Hospital v. Southern California District Council of Carpenters, 125 F.3d 1230, 1236 (9th Cir. 1997). See also, Sheet Metal Workers, Local 15 (Brandon Regional Hospital), Case 12-CC-1258, Advice Memorandum date April 4, 2003; Local 79, LIUNA (Calleo Development Corp.), Cases 2-CC-2546, et al., Appeals Minute dated January 24, 2003.

FN11. See, e.g., Lawrence Typographical Union No. 570 (Kansas Color Press), 169 NLRB 279, 283 (1968), enfd. 402 F. 2d 452 (10th Cir. 1968), citing Lumber & Sawmill Workers Local No. 2797 (Stoltze Land & Lumber Co.), 156 NLRB 388, 394 (1965). See also, Service Employees Local 87 (Trinity Maintenance), 312 NLRB 715, 743 (1993), enfd. mem. 103 F.3d 139 (9th Cir.

1996).

FN12. Trinity Maintenance, above, 312 NLRB at 743.

FN13. Teamsters, Local 505 (Carolina Lumber), 130 NLRB 1438, 1440 (1961) (citations omitted); Laborers, Local 332 (C.D.G., Inc.), above, 305 NLRB at 305. See also, Operating Engineers, Local 150 (Hamstra Builders), 304 NLRB 482, 484 (1991), citing Carpenters Local 33 v. NLRB, 873 F.2d 316, 322 (D.C. Cir. 1989) (no actual impact on neutrals need be proven); Teamsters, Local 85, 243 NLRB 665, 666 (1979) (citations omitted) (picketing neutral employer was calculated to induce and encourage neutral employees to withhold services in violation of 8(b)(4)(i)(B), regardless whether the picketing actually caused any work stoppage by neutral employees); Teamsters, Local 126, 200 NLRB 253, 277 (1972) (union induced and encouraged neutral employees to stop working when pickets arrived, union's failure to cause any employees to actually refuse to work was immaterial).

FN14. See, e.g., NABET Local 31 (CBS, Inc.), 237 NLRB 1370, 1376 (1978), enfd. 631 F.2d 944 (D.C. Cir. 1980) (disclaimer at bottom of handbill was a "self-serving disavowal" given the manner in which the handbill was distributed). See generally, Catalytic, Inc. v. Monmouth & Ocean County Bldg. Trades Council, 829 F.2d 430, 432, 435 (3d Cir. 1987), cert. denied, 485 U.S. 1020 (1988) (disclaimer on handbill was a "carefully vague and legalistic statement," the tone of which may have signaled neutral employees to cease work); Electrical Workers Local 453 (Southern Sun Electric), 252 NLRB 719, 723 (1980) (union's self-serving disclaimer of picketing for recognitional purposes is not determinative of whether union was engaged in lawful picketing).

FN15. Teamsters Local 122 (August A. Busch & Co.), 334 NLRB No. 137, slip op. at 15 (2001) (citations omitted), enfd. 2003 WL 880990 (D.C. Cir. 2003). See also Trinity Maintenance, above, 312 NLRB at 743 (citations omitted).

FN16. See Painters District Council 9 (We're Associates), 329 NLRB 140, 142 (1999) (individuals carrying picket signs "without sticks" was picketing); Brewery Workers Local 366 (Adolph Coors Co.), 121 NLRB 271, 282 (1958) (picketing consisted not of signs with sticks, but placards fashioned into sandwich boards). See also, Trinity Maintenance, above, 312 NLRB at 750 (demonstrators never carried conventional placards, but carrying message bearing flags at the entrances to two buildings "clearly constituted picketing").

FN17. See, e.g., Kansas Color Press, above, 169 NLRB at 283, citing Stoltze Land & Lumber Co., above, 156 NLRB at 394.

FN18. Service & Maintenance Employees Local 399 (William J. Burns Intl. Detective Agency, Inc.), 136 NLRB 431, 437 (1962)(handbillers impeded customer access to neutral employer's premises in a manner that also included element of physical restraint).

FN19. See Teamsters Local 688 (Levitz Furniture Co.), 205 NLRB 1131, 1133 (1973).

FN20. Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Trades Council, 485 U.S.

568 (1988).

FN21. 485 U.S. at 574-77.

FN22. Id. at 578 (quoting NLRB v. Drivers, 362 U.S. 274, 290 (1960)).

FN23. Mine Workers (New Beckley Mining), 304 NLRB 71, 71, 72 (1991), enfd. 977 F.2d 1470 (D.C. Cir. 1992) (finding mass picketing in violation of 8(b)(4)(ii)(B) where 50-140 union supporters milled about in parking lot outside neutral facility around 4:00 a.m. while shouting antagonistic speech to replacement employees). See also Service & Maintenance Employees Union No. 399, above, 136 NLRB at 432, 436 ("[t]hat such physical restraint and harassment must have been intended may be inferred from the number [20-70] of marchers engaged in patrolling (far more than required for handbilling or publicity purposes)"); Mine Workers District 12 (Truax-Traer Coal Co.), 177 NLRB 213, 218 (1969) (finding picketing where approximately 200 union agents arrived at the worksite and congregated around or in their parked cars).

FN24. See General Service Employees Union Local 73 (Andy Frain), 239 NLRB 295, 306, 307 (1978) (finding union's handbilling was picketing that violated 8(b)(4)(i) and (ii)(B) where union distributed handbills, displayed signs in parked cars, photographed neutrals, and previously picketed facility; finding union's photographing under circumstances inherently coercive where it took place at reserved neutral gate and where cameras had no film).

FN25. See, e.g., Hoffman Construction, above, 292 NLRB at 562 n. 2, 571-576; Telephone Man, 327 NLRB at 593 and n. 3; Woodward Motors, above, 135 NLRB at 851, fn. 1, 857; Calcon Construction), above, 287 NLRB at 573; Athejen Corp., above, 260 NLRB at 1319.

FN26. See Carpenters (Society Hill Tower Owners Ass'n), 335 NLRB No. 67, slip op. at 15 - 16 (2001) (union harassed tenants of neutral apartment building to force the neutral employer to cease doing business with contractor violated Section 8(b)(4)(ii)(B)); New Beckley Mining, above, 304 NLRB at 72-73 (50 to 140 union members outside motel yelling at replacement workers violated Section 8(b)(4)(ii)(B)); General Maintenance, above, 329 NLRB at 639 fn. 12; 679-680 (union agents' conduct was undertaken with "the certain knowledge that they would inconvenience tenants and others entitled to the peaceable use of the buildings" and, therefore, violated Section 8(b)(4)(ii)(B)); Trinity Maintenance, above, 312 NLRB at 746-748 (union's harassment of tenants was effort to force neutral building owner to cease doing business with the contractor and violated Section 8(b)(4)(ii)(B)).

FN27. See generally Safeco, above, 447 U.S. 607; Honolulu Typographical, above, 401 F.2d at 957("[W]hen customers must refuse to respect a picket line in order to enter the store, the storekeeper is being threatened within the meaning of [Section 8(b)(4)(ii)(B)]".).

## CERTIFICATE OF SERVICE

I, Carol McCool, Legal Assistant, hereby certify that on this 10th day of December, 2007, I caused to be served upon plaintiffs' counsel two true and correct copies of Defendants' Motion for Partial Summary Judgment and Brief in Support of Motion by First Class U.S. Mail to the following address:

John F. Brady, Esquire
Counsel to the Plaintiffs
P. O. Box 251
Georgetown, Delaware  19947


/s/Carol McCool
_____
Carol McCool